UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICKY UNDERHILL, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 1:16-cv-00687-SEB-TAB |
| BENJAMIN LOVERIDGE Medical Doctor, Corizon, LLC, TRACY PROFITT Health Services Administrator, Corizon, LLC, DEBORAH L PERKINS Nurse Practitioner, CASSANDRA BROWN Nurse, Corizon, LLC, | ) |
| Defendants. | ) |

**Entry Discussing Motion for Summary Judgment**

Plaintiff Ricky Underhill, an Indiana inmate, filed this civil action pursuant to 42 U.S.C. § 1983 complaining about events that occurred which he was incarcerated at the New Castle Correctional Facility ("New Castle"). He alleges that between January 2014 and October 10, 2014 (when he was transferred to Westville Correctional Facility) he was denied constitutionally adequate medical treatment for his injured left shoulder and arm. The defendants have filed a motion for summary judgment and Underhill has responded. For the following reasons, the motion for summary judgment, dkt. [20], is **granted in part and denied in part.**

**I. Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable

inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. Statement of Facts

The following statement of facts is evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Underhill as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

### A. *Underhill's Care Between January 2014 and March 2014*

Underhill's left shoulder and arm were injured in January 2014 when his arm was pulled down while he was shackled. Cassandra Brown, LPN saw him on January 27, 2014. Underhill stated that his shoulder was "sore and still burning." Dkt. 21-1 pg 179. During her examination, Nurse Brown did not observe any visible sign of injury to Underhill's left shoulder. *Id.* The range of motion in his left arm was within normal limits, his left shoulder reflected normal placement, and no swelling was noted. *Id.* Nurse Brown notified Nurse Practitioner Deborah Perkins of the

results of her examination. NP Perkins determined that, based on the results of the physical examination, there was no need for x-ray orders at that time.

Nurse Brown examined Underhill again on February 16, 2014. He told her that his left should pain was a 7-8 on a scale of 1-10 and the pain medication he was using was not effective. Dkt. 21-2, pg. 177. Underhill requested a referral to the facility doctor, but Nurse Brown did not refer him to the doctor. Dkt. 30-1, par. 7.

On about February 20, 2014, Underhill went on a "hunger strike" because he felt he was not receiving adequate medical care for his injured arm and shoulder. Dkt. 30-1, par. 8. On February 24, 2014, Underhill was seen by Nurse Brown for evaluation of the hunger strike. Underhill stated he would not eat until he received an MRI for his shoulder. Dkt. 21-2, p. 172-74. He also stated that he was refusing to eat because he had been assaulted by a correctional officer. Nurse Brown noted that Underhill "had refused medical trip out this AM (which was for MRI)." *Id.* She reported Underhill stating, "I thought the trip out was for the urologist again or else I would've went."[1] *Id.* Underhill states that he also saw Dr. Loveridge that day who told him that after he regained his strength, "they would schedule . . . an appointment within two weeks concerning his arm and shoulder." Dkt. 30-1, par. 9.

On March 9, 2014, Underhill filled out a Request for Health Care requesting to be seen by a NP or doctor concerning his injury and was told he had a scheduled appointment. Dkt. 30-2,

---

[1] For security reasons, inmates are not informed of the exact time or location of an outside medical provider visit. It appears that there must have been a misunderstanding if Underhill was informed that his outside medical appointment on February 24, 2014, was for an MRI instead of for his urological condition. In addition to there being no medical records reflecting that Underhill was recommended for an MRI in February 2014, the scheduled outside provider visit that had been scheduled for Underhill on February 24, 2014, was for his urological condition as he was sent out for a urological visit shortly thereafter.

pg. 53. Underhill submitted another Request for Health Care on March 20, 2014, asking again to seen for his shoulder pain. Dkt. 30-2, pg. 54.

B. *Care Between April 2014 and Underhill's Transfer to Westville Correctional Facility*

Underhill started another hunger strike on about April 2, 2014, because he felt that he was not receiving adequate medical care, including that he had not been seen by Dr. Loveridge as requested. Dkt. 30-1, par. 12. On April 9, 2014, Underhill saw Dr. Loveridge and Tracy Profitt[2] and they told him "you are not receiving further medical treatment for your left shoulder because there is nothing wrong with you." Dkt. 21-2, pg. 161; dkt. 30-1. par. 14.

On April 10, 2014, Underhill was seen by Nurse Brown for his complaints of mild to moderate left upper quadrant pain and left shoulder pain. Dkt. 21-2, pg. 157. There is no record of any treatment or recommendations given for the shoulder pain that day. On about April 15, 2014, Underhill saw NP Perkins. He asked for an MRI or a referral to a doctor, but NP Perkins denied these requests. Dkt 30-1, par. 16; Dkt. 30-2, pg. 57.

On April 30, 2014, NP Perkins saw Underhill for a chronic care visit. His reported present conditions were hyperlipidemia and gastroesophageal reflux disease ("GERD"). The chart reflects that NP Perkins inquired twice if Underhill had any further health care complaints, and he responded, "no." She noted in Underhill's chart that "he was very quiet today with no complaints which was unusual for him." She ordered follow up labs for his lipid levels. But Underhill states that he complained of his shoulder pain and NP Perkins once again denied his request for a referral. Dkt. 30-2, par. 18.

Six days later, on May 6, 2014, Underhill was seen again by NP Perkins for a medical provider visit to evaluate his complaints of left shoulder pain. Underhill stated the pain was

---

[2] Defendant Tracy Profitt Mills, is the Health Services Administrator (HSA) at New Castle. She was no responsible for directing Underhill's medical care at any time.

burning and dull and was aggravated by lifting and pushing. Upon examination, NP Perkins did not observe any redness or swelling in Underhill's left shoulder. After her examination, NP Perkins provided Underhill with written instructions for rotator cuff and shoulder conditioning exercises. NP Perkins informed Underhill that if he would try the exercises, she would recommend him for physical therapy. According to NP Perkins, Underhill refused the exercise instructions and informed NP Perkins that he only wanted an MRI. Underhill states that the exercises "aggravated" his injury.

On May 8, 2014, Underhill was seen again by NP Perkins in response to his complaint of left shoulder pain. Underhill reported his symptoms as moderate, but that the pain was not going away. NP Perkins evaluated Underhill's range of motion in his left shoulder as good. He was able to rotate the arm with little pain. He could lift his left arm to a 45-90 degree angle to the side, but was not able to reach to the ceiling. NP Perkins did not note any redness or swelling in the left shoulder area. Underhill's hand grips were equal and there was no muscle mass loss. She noted that she had seen Underhill twice recently and had offered treatment to address his shoulder pain, but Underhill stated that the exercises were ineffective. NP Perkins believed that over-the-counter pain relievers were appropriate on an "as needed" basis. She did not feel that there was any clinical indication to prescribe narcotic level pain relievers for Underhill's shoulder condition.

Dr. Loveridge saw Underhill on June 26, 2014, for follow up on his complaints of left shoulder pain. Dr. Loveridge examined Underhill's left shoulder. Rotation of the left shoulder was normal, but his ability to raise his left arm to the side was limited to about 90 degrees. There was no visible deformity in the left shoulder. Underhill had mild to moderate tenderness. Underhill stated that sitting still made the pain worse and that movement of the shoulder helped

relieve pain. Based on Underhill's physical examination, including his rotation ability, location of pain, and a review of his medical record, Dr. Loveridge diagnosed Underhill with a grade 1 AC joint separation. This is a common type of shoulder injury involving a sprain or partial tear of shoulder AC ligaments. The initial recommended treatment for a partial tear or sprain of the AC ligaments is rest, range of motion exercises as tolerated, and over-the counter pain medications as needed. Dr. Loveridge instructed Underhill on range of motion exercises and informed him that doing the exercises in his cell would improve his shoulder condition over time. Dr. Loveridge gave Underhill a steroid injection to help with his complaints of pain during movement and to allow him to begin his range of motion exercises with reduced pain. Underhill expressed understanding of the recommendations.

Based on Underhill's physical examination and Dr. Loveridge's review of his medical record, Dr. Loveridge concluded that an MRI was not indicated until and unless intractable symptoms failed to respond to the therapeutic exercises and over-the-counter pain medications. Dr. Loveridge believed that over-the-counter analgesics were appropriate to address his pain on a symptomatic basis. Underhill states that he requested a prescription because he was not permitted to order over-the-counter medications from the commissary in the Restricted Housing Unit. Dkt. 30-1, par. 23.

On August 6, 2014, Underhill was seen for the first time by Nurse Practitioner Desma Allen for his complaints of left shoulder pain. NP Allen discussed his condition with him. She noted that he had been seen multiple times by NP Perkins and once by Dr. Loveridge. She noted that Underhill had received a steroid injection five weeks prior and had been instructed on range of motion exercises for his shoulder pain. NP Allen informed Underhill that surgery was not recommended for his shoulder condition at that time. He was not pleased with that answer and

walked out of the examination room before NP Allen could complete the full physical examination. According to Underhill, NP Allen told him that she and the other defendants believed he was "faking" his injury. Dkt. 30-1, par. 24.

On August 19, 2014, Underhill was seen by NP Perkins for a chronic care visit to evaluate his symptoms of GERD, high cholesterol level, left shoulder pain, and enlarged prostate. NP Perkins noted that Underhill's medical conditions were under control except he continued to complain that he was experiencing pain in his left shoulder and left flank. A review of his medical records reflected that Underhill had been seen by Dr. Loveridge several weeks earlier and given a steroid shot and therapeutic exercises. NP Perkins also noted that she had attempted to provide Underhill with therapeutic exercises which he refused. Upon examination, NP Perkins did not note any abnormalities in his left shoulder and encouraged him to do the recommended shoulder therapy exercises.

On September 9, 2014, at 11:43 a.m., Underhill was seen by Cassandra Brown, LPN, because he had initiated another hunger strike and had refused his scheduled nurse wellness visit required by his hunger strike status. Nurse Brown noted that Underhill refused to come out of his cell for a wellness check, had missed five meals, would not sign a refusal of treatment form, and stated he was continuing his hunger strike. Nurse Brown stated in her nursing note that the medical director and various administrative staff were notified of Underhill's latest hunger strike status.

Later that day at 2:06 p.m., Underhill was seen for a behavioral health follow up visit with mental health provider Christopher Hufford, at which time Underhill stated that he was on a hunger strike to force a transfer to another facility. Hufford encouraged Underhill to consider other alternatives to a hunger strike. He noted that Underhill was not amenable to further

discussion. That evening at 6:02 p.m., Guyanna Bedwell, LPN, entered a nurse protocol use of force evaluation required by Underhill's refusal to come to the nurses' office for physical assessment during his hunger strike. Then, at 11:24 p.m., Underhill was seen by Erica M. Ellington, R.N. in response to an emergency call involving a report by custody staff of Underhill stating that he had experienced seizure activity. The medical records reflect that Underhill was examined in his cell by Erica M. Ellington, R.N. in the presence of custody staff. Upon examination for his reported seizure, Underhill was alert and oriented, had no breathing difficulties, and no seizure activity was noted. Underhill stated to Nurse Ellington, "get out of here. Leave me alone." Underhill refused any medical treatment and a Refusal of Treatment form was completed by Nurse Ellington.

On September 10, 2014, Underhill was seen by Nurse Bedwell for follow-up on his cell extraction and his reported seizure activity the night before. He reported dizziness when standing up and a knot on right side of his head. Upon examination, Underhill stated that he had injured himself during recreation. He did not recall falling the night before. He noted that bruising on his wrists and arms was from resisting a cell extraction the day before. During the examination, Underhill was alert and oriented. He stated that he had started eating again. Underhill was given over-the-counter Acetaminophen.

On September 25, 2014, Underhill was seen by NP Allen for follow up. Underhill reported tenderness in his left shoulder and mild pain with motion. NP Allen did not observe and Underhill did not report numbness, tingling, joint instability, or decreased mobility in his left shoulder. NP Allen reported that Underhill's physical "exam is essentially negative and he does not appear to be in any distress." NP Allen further noted that she would prescribe Celexa to

address Underhill's continuing complaints of shoulder pain. She also prescribed a tapering dose of steroids to address Underhill's pain complaints.

C. *Underhill's Transfer to Westville Correctional Facility*

On October 10, 2014, Underhill was transferred to Westville Correctional Facility. ("Westville") and did not receive further treatment from any of the defendants. The medical records reflect that Underhill received an x-ray of his left shoulder on November 25, 2014, which reflected no abnormalities. Eight months later, on July 15, 2015, Underhill received an MRI of his left shoulder. The MRI results reflected that Underhill had a partial thickness under surface tear of his rotator cuff tendon. Dr. Loveridge contemplated this as a possibility when he diagnosed Underhill with a grade 1 AC joint separation on June 26, 2014. It is unclear when the partial tear of Underhill's rotator cuff occurred as he had complained several times of injuring his left shoulder and even when he reported that his shoulder was injured in January 2014, he stated that he had "injured his left shoulder again."

The medical records reflect that, after his transfer to Westville, during January 2016, Underhill was prescribed four sessions of physical therapy at an outside facility for the purpose of strengthening and stabilizing his shoulder. Underhill stated that he had not been performing any therapeutic exercises on his own as they caused pain. He was provided a Home Exercise Plan (HEP) for use in his cell by his outside physical therapist to assist him in strengthening his shoulder. On January 23, 2016, Underhill submitted a request for health care stating that his course of outside physical therapy had injured his left shoulder. When he was scheduled for a nursing visit to follow up on his complaints that he had been injured in physical therapy, he refused treatment. The physical therapy treatment prescribed in January 2016 to treat Underhill's partial tear of his rotator cuff tendon was almost identical to the treatment prescribed by Dr.

Loveridge and NP Perkins at New Castle which Underhill refused to follow. Conservative, non-surgical treatment designed to build up Underhill's shoulder strength and increase the range of motion in his left shoulder were the goals of therapeutic exercise recommended by medical providers at both facilities.

D. *Treatment for Shoulder Injuries*

The defendants explain that in about 50% of patients, nonsurgical treatment of a partial tear of the rotator cuff relieves pain and improves function in the shoulder. Nonsurgical treatment options may include: rest, activity modification, non-steroidal anti-inflammatory medication (such as ibuprofen and naproxen), strengthening exercises, physical therapy, and steroid injection. Surgery may eventually be recommended for some rotator cuff injuries. Signs that rotator cuff surgery is recommended include: symptoms lasting six to twelve months, a large tear of the tendon, and significant loss of function in the shoulder. Complications from rotator cuff surgery may include: nerve damage, infection, deltoid muscle detachment; persistent stiffness and loss of motion, and re-tear of the tendon. (http://orthoinfo.aaos.org/topic.cfm?topic=a00064).

All of the defendants state that they believed that over-the-counter pain medications taken on an as-needed basis would be sufficient to manage Underhill's pain. Underhill states that he was not able to obtain over-the-counter medications because he was being held in Restricted Housing at the time. The defendants state that although inmates in Restricted Housing are not allowed to keep medication in their cells, there is no prohibition on receiving over-the-counter medications dispensed by nursing staff on their daily rounds. They also argue that Underhill's statement to the contrary is demonstrably false because Underhill did obtain acetaminophen from the commissary on one occasion. But the records reflect that Underhill was given over-the-

counter acetaminophen by Nurse Bedwell, who examined him after a cell extraction and possible seizure. It is not clear from the records whether he ordered that medication from the commissary or Nurse Bedwell simply gave it to him. There is thus a dispute of fact regarding whether Underhill could have obtained over-the-counter medications while in Restricted Housing.

### III. Discussion

Underhill asserts that all of the defendants failed to provide him with adequate medical care for his injured shoulder. At all times relevant to his claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The defendants argue that some of Underhill's claims are barred by the statute of limitations and that they did not violate his Eighth Amendment rights.

A. *Statute of Limitations*

The defendants first argue that Underhill's claims are limited by the applicable statute of limitations. The statute of limitations for civil rights suits under 42 U.S.C. § 1983 is determined by the statute of limitations for personal injury actions in the state where the incident forming the basis of the claim occurred. *See Wilson v. Garcia,* 471 U.S. 261, 275 (1985); *Eison v. McCoy,* 146 F.3d 468, 470 (7th Cir.1998); *Baskin v. City of Des Plaines,* 138 F.3d 701, 702-03 (7th Cir. 1998). Thus, Underhill's 42 U.S.C. § 1983 claim for deliberate indifference to his serious medical needs is governed by Indiana's two-year statute of limitations for personal injuries. *See Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 894 (7th Cir. 2001)

("Indiana's two-year statute of limitations . . . is applicable to all causes of action brought in Indiana under 42 U.S.C. § 1983.") Underhill filed this lawsuit on March 25, 2016. The statute of limitations therefore bars all of Underhill's claims based on events that occurred before March 25, 2014. The Court notes, however, that while these claims are barred, Underhill's medical complaints and the treatment he received for those complaints is relevant to the extent it shows the knowledge the defendants had of his condition and his continuing complaints.

B. *Deliberate Indifference*

Each of the defendants also seeks summary judgment on Underhill's Eighth Amendment claims. Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

The defendants do not contend for purposes of summary judgment that Underhill's injured shoulder was not a serious medical condition. But they each argue that they were not deliberately indifferent to this condition. "Conduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir.

1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Underhill's claims are based not only on the contention that the treatment he received for his underlying condition was inadequate, but also on the assertion that the defendants failed to treat his pain. A delay in treatment that causes unnecessary pain is actionable even if it did not exacerbate the injury or diminish the chances of a full recovery. *See Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (holding that the plaintiff stated an Eighth Amendment claim because "even though this [four-day] delay [in treatment] did not exacerbate [the plaintiff's] injury, he experienced prolonged, unnecessary pain as a result of a readily treatable condition"); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). Underhill's deliberate indifference claims against each defendant is discussed in turn.

1. *Nurse Brown*

Nurse Brown seeks summary judgment on Underhill's claims arguing that her assessment and treatment of his complaints was appropriate. She asserts that, as a licensed practical nurse, she did not have authority to prescribe medications or recommend outside testing or treatment. She argues that she either directly consulted with a medical provider or appropriately referred Underhill to a medical provider for follow-up every time she saw him.

The first time Nurse Brown saw Underhill after March 25, 2014, was on April 10, 2014, one day after he had ended a hunger strike based on his complaint that he was not receiving adequate medical care. At that appointment, Nurse Brown examined him related to his complaints of upper quadrant pain and left shoulder pain. There is no record of any treatment or recommendation for his shoulder pain that day. Between that appointment and September 9, 2014, Underhill was seen by other providers for his shoulder complaints. Nurse Brown saw Underhill on September 9, 2014, because he had initiated another hunger strike and had refused his scheduled nurse visit required by his hunger strike status. While Nurse Brown evaluated Underhill's medical condition based on the hunger strike, there is no record that she provided any evaluation or treatment for his shoulder pain.

Here, there is a genuine issue of material fact regarding whether Nurse Brown was deliberately indifferent to Underhill's shoulder pain. A review of the facts in the light most favorable to Underhill reveals that during the time frame relevant to his claims, he saw Nurse Brown twice. The records reflect that he complained to her of shoulder pain each of those times, but there is no record that she made a recommendation or otherwise provided Underhill with treatment for his complaints of shoulder pain. Moreover, each time Nurse Brown saw him, he had initiated a hunger strike based on his belief that he was not receiving care for his shoulder. A

reasonable response to this action might have been at least to examine his shoulder. Based on these facts, a reasonable jury could conclude that Nurse Brown knew Underhill was experiencing serious pain and a possible shoulder injury, but did nothing to treat his injury or his pain. *See Arnett*, 658 F.3d at 753 ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). Nurse Brown is therefore not entitled to summary judgment.

2. *NP Perkins*

NP Perkins also seeks summary judgment on Underhill's deliberate indifference claims. She argues that she provided Underhill with medical care that met or exceeded the applicable standard of care.

The first time NP Perkins saw Underhill after March 25, 2014, was on April 30, 2014, when she saw him for his chronic care visit to evaluate his hyperlipidemia and GERD conditions. There is an issue of fact regarding the conversation she and Underhill had at this visit. NP Perkins states that she specifically inquired if he had any other health concerns and he stated that he did not. But Underhill states that he was seen by NP Perkins "concerning [his] reinjured left arm and shoulder and during this scheduled appointment [she] refused once again to refer [him] for further treatment . . . ." NP Perkins saw Underhill again May 6, 2014, for his complaints of shoulder pain and recommended exercises to improve shoulder strength and reduce pain symptoms. She told him that if he would try the exercises, she would recommend him for physical therapy, but Underhill would not do the exercises. NP Perkins saw Underhill again on August 19, 2014, for a chronic care visit. Underhill's medical records revealed that he had been seen by Dr. Loveridge several weeks earlier and was given a steroid shot and prescribed therapeutic exercises. NP Perkins noted that she had attempted to provide Underhill with

therapeutic exercises which he refused. Upon examination, she did not note any abnormalities in Underhill's left shoulder and encouraged him to try the exercises. NP Perkins concluded that Underhill's symptoms did not reflect that his shoulder required constant pain medication or that he was suffering from an emergent condition.[3]

Construing these facts in the light most favorable to Underhill, a reasonable jury could conclude that NP Perkins was deliberately indifferent to Underhill's pain. First, there is a dispute of fact regarding whether Underhill raised his shoulder pain complaints with her on April 30, 2014. If a jury believed Underhill, it could reasonably conclude that NP Perkins was deliberately indifferent by failing to address his complaints. In addition, while NP Perkins might have reasonably concluded on May 6, 2014, that Underhill should perform strengthening exercises in his cell before advancing to more aggressive treatment and that an ongoing prescription for pain medication was not necessary, Underhill has raised a dispute of fact regarding whether she should have made sure that he could receive over-the-counter pain medication as needed. As explained above, the defendants state that Underhill could have received over-the-counter pain medications from the commissary while he was in Restricted Housing, but Underhill states that he could not have. If a reasonable jury believes Underhill's statement of the facts, it could conclude that NP Perkins ignored his complaints and failed to provide him with a means of pain

---

[3] The Court notes that the defendants describe Underhill as a "difficult patient" who, among other things, refused recommendations, missed appointments, filed duplicative requests for health care, and often was cuffed when he did arrive at medical visits. The defendants argue that Underhill was provided with adequate care despite these difficulties. But, while whether Underhill missed appointments and refused exercises recommendations might be relevant, whether Underhill overall was a "difficult patient" is not relevant to whether the medical he received was adequate. If Underhill was cuffed at appointments, and this hampered a defendant's ability to examine him, the defendants could have asked for the cuffs to be removed. In addition, another reasonable inference from the fact that Underhill filed so many health care requests – other than the defendants' inference that Underhill was intentionally being difficult – is that he was in serious pain and pleading for treatment.

control, causing him to experience unnecessary pain. *Gomez*, 680 F.3d at 865-66. NP Perkins is therefore not entitled to summary judgment.

### 3. *Dr. Loveridge*

Dr. Loveridge next argues that he is entitled to summary judgment on Underhill's claims. Dr. Loveridge saw Underhill on April 9, 2014, because Underhill had been on a several-day hunger strike. Underhill states that Dr. Loveridge told him he would not receive further medical treatment for his shoulder because there was nothing wrong with him. Dr. Loveridge then examined Underhill on June 26, 2014, and concluded that Underhill's symptoms suggested a grade 1 AC joint separation – a shoulder injury involving a sprain or partial tear of shoulder AC ligaments. Dr. Loveridge explains that these symptoms generally do not require surgery as the initial treatment – especially not without an initial course of therapeutic exercise. Dr. Loveridge points out that for the nine months following his transfer from New Castle, Underhill was not prescribed an MRI. He was prescribed an MRI in June 2015 and recommended for physical therapy in January 2016.

Based on these facts, which have been construed in the light most favorable to Underhill, a reasonable jury could conclude that Dr. Loveridge was deliberately indifferent to Underhill's shoulder pain. While Doctor Loveridge provided Underhill with appropriate treatment on June 26, 2014, Underhill states that he also saw Dr. Loveridge on April 9, 2014. Underhill states that he was pursuing a hunger strike on April 9, 2014, because he felt he was not being treated for his shoulder injury. According to Underhill, Dr. Loveridge provided no treatment that day. If this is true, a reasonable jury could conclude that, while he evaluated the hunger strike, Dr. Loveridge provided no treatment or recommendation for Underhill's underlying complaint – his shoulder pain. Dr. Loveridge therefore is not entitled to summary judgment.

4. *NP Allen*

NP Allen also argues that she is entitled to summary judgment on Underhill's deliberate indifference claims. Underhill saw NP Allen on August 6, 2014. Underhill walked out of the examination room before the exam was over apparently because he was unhappy that NP Allen reported that Dr. Loveridge had stated that his shoulder condition did not require surgery at that time. She saw him again on September 25, 2014, to address his complaints of headache and dizziness related to a seizure he may have had after a cell extraction. Based on his continuing complaints of shoulder pain, she prescribed Celexa and a tapering dose of steroids.

NP Allen is entitled to summary judgment on Underhill's claims. The first time she saw him, he left the exam room before she could complete her examination. She cannot be expected to treat him if he abandoned the examination. The next time she saw him, she prescribed him pain medication and steroids. There is no evidence that she ignored his complaints or otherwise failed to treat him. There is also no evidence that "no minimally competent professional would have [done the same] under those circumstances." *Pyles*, 771 F.3d at 409.

5. *HSA Profitt*

Finally HSA Profitt argues that she is entitled to summary judgment because she made no medical decisions for Underhill. As the HSA at New Castle, HSA Profitt was responsible for administrative tasks such as personnel supervision, staff scheduling oversight, procurement, fiscal management, maintenance supervision, and records supervision. The record reflects that Underhill was regularly scheduled to see medical providers. Profitt was not a medical provider and could not prescribe medications or order any doctors or nurses to prescribe medications or recommend outside consultations. In other words, Profitt could not, and did not, make decisions regarding Underhill's medical care, other than oversight of scheduling and records, which the

records reflect she did. This is true, even if, as Underhill states, she reiterated Dr. Loveridge's conclusion that there was "nothing wrong" with him. Underhill states generally that HSA Profitt refused to help him. But this general allegation is insufficient to create a genuine issue of material fact with regard to his claim against her. Profitt is therefore entitled to summary judgment on Underhill's claims against her.

### IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [20], is **granted in part and denied in part**. The motion is **granted** as to Defendants NP Allen and HSA Profitt and the claims against them are **dismissed**. The **clerk shall** terminate Allen and Profitt as defendants. The motion is **denied** as to Defendants Brown, Loveridge, and Perkins. The Court will direct further proceedings through a separate order. If Underhill wishes to request the assistance of counsel, he should file a motion on the Court's form, which the **clerk shall** include with his copy of this Entry.

**IT IS SO ORDERED.**

Date: 2/13/2018

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RICKY UNDERHILL
953146
PENDLETON - CIF
CORRECTIONAL INDUSTRIAL FACILITY
Inmate Mail/Parcels
5124 West Reformatory Road
PENDLETON, IN 46064

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com